COURT OF CHANCERY
OF THE
STATE OF DELAWARE

LOREN MITCHELL
MAGISTRATE IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Date Submitted: June 4, 2026
Date Issued:  July 20, 2026

Hugh J. Marbury, Esquire
Joshua Seiler, Esquire
Joel G. Weinberg, Esquire
Cozen O'Connor LLP
1201 N. Market Street, Suite 1001
Wilmington, DE 19801

Gregory Blue, Esquire
Gary J. Gorham, Esquire
Lachtman Cohen & Belowich LLP
11811 San Vicente Blvd., Suite 414
Wilmington, DE 19801

Joel G. Weinberg, Esquire
Precision Counsel APC
9465 Wilshire Blvd., Suite 300
Beverly Hills, CA 90212

Thomas A. Uebler, Esquire
Brian V. DeMott, Esquire
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Re:     *Ekaterina Tchernavskikh v. Peter "PJ" Accetturo, et al.*
        C.A. No. 2025-1284-LM

Dear Counsel,

This letter resolves the Defendants' pending motion to dismiss.  The core issues of this motion are whether the plaintiff, Ekaterina Tchernavskikh ("Plaintiff"), has standing to sue derivatively on behalf of FilmPort, Inc., and whether her individual claims are adequately pled to survive Delaware's "reasonable conceivability" standard.

For reasons further explained below, the Court finds that Plaintiff fails to state a claim for breach of contract, fraud, and negligent misrepresentation, but has

sufficiently pleaded her remaining claims. Therefore, Defendants' motion to dismiss is **DENIED IN PART** and **GRANTED IN PART**.

## I.      FACTUAL BACKGROUND

On September 2024, Plaintiff and Peter Accetturo co-founded FilmPort, an AI film production company, and agreed that Plaintiff would be Chief Technology Officer ("CTO"), and that Mr. Accetturo would be Chief Executive Officer ("CEO") and FilmPort's sole director.[1] Plaintiff alleges the parties initially agreed that Plaintiff would receive 30% of FilmPort equity, and Mr. Accetturo would receive 70%.[2]

After Mr. Accetturo posted a controversial viral video, Plaintiff alleges that on October 3, 2024, to persuade her to remain at FilmPort, the parties agreed that Plaintiff would gain a director position on FilmPort's board, and gain an additional 20% equity stake, making both Mr. Accetturo and Plaintiff 50% FilmPort stockholders.[3] Plaintiff also signed the Restricted Stock Purchase Agreement ("RSPA"), which provides that upon cessation as a service provider, FilmPort has

---

[1] Docket Item ("D.I.") 1 ¶ 19–20; D.I. 1, Ex. 3.

[2] D.I. 1 ¶ 19–20.

[3] *Id*. ¶¶ 26, 28.

an option to repurchase un-released shares at the Plaintiff's purchase price.[4] Although no documentation has been provided, Plaintiff alleges the parties executed the RSPA after an alleged oral agreement with Mr. Accetturo on October 3, 2024, and then backdated the signing date to September 13, 2024.[5]

Around December 2024, the parties agreed that Plaintiff was effectively FilmPort's CEO, and that Mr. Accetturo would become Chief Creative Officer ("CCO").[6] Plaintiff points to a January 17, 2025, email between Mr. Accetturo and Jupiter Agency, in which Mr. Accetturo stated that Plaintiff was the CEO and co-founder of FilmPort.[7] She also relies on a January 28, 2025, O-1 visa support letter in which Mr. Accetturo stated that Plaintiff was a co-founder and CEO of FilmPort, and that she managed all operational and financial aspects of the organization.[8]

On January 14, 2025, FilmPort hired Tawny Toci as its COO.[9] Ms. Toci created a capitalization table ("Cap Table") listing Plaintiff as a 50% FilmPort stockholder.[10]

---

[4] D.I. 16 at 1.

[5] D.I. 1 at 12.

[6] *Id.* ¶ 35.

[7] *Id.*, Ex. 5.

[8] *Id.*, Ex. 9.

[9] *Id.* ¶ 41.

[10] *Id.* ¶ 42; D.I. 1, Ex. 8.

On February 14, 2025, Plaintiff claims that Mr. Accetturo and Ms. Toci called a joint meeting, suggesting that Mr. Accetturo should retake FilmPort's CEO position.[11] Ten days later, Mr. Accetturo and Ms. Toci terminated Plaintiff's employment with FilmPort.[12]

On March 11, 2025, Mr. Accetturo sent Plaintiff an email stating that he was initiating FilmPort's dissolution.[13] On May 13, 2025, discovering that FilmPort was still operational, Plaintiff sent a letter to FilmPort demanding its books and records and to set a litigation hold.[14] FilmPort rejected Plaintiff's demands.[15]

Plaintiff initiated this Action on November 6, 2025, alleging derivative claims on behalf of FilmPort as well as individual claims. Plaintiff alleges loss of equity in FilmPort, lost compensation, lost employment opportunities, damages resulting from Plaintiff's O-1 Visa Application complications, relocation costs, and emotional distress.[16] On December 23, 2025, Defendants moved to dismiss, in which they raise

---

[11] D.I. 1 ¶ 46.

[12] *Id*. ¶ 49.

[13] *Id*. ¶ 53; D.I. 1, Ex. 11.

[14] D.I. 1 ¶¶ 56–57.

[15] *Id*. ¶ 57.

[16] *Id*. ¶¶ 52, 55, 63; D.I. 1, Ex. 12.

that Plaintiff has no standing to assert derivative claims on behalf of FilmPort, and that Plaintiff fails to state valid individual claims.[17]

## II.   ANALYSIS

When considering a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court accepts all well pleaded facts as true, accepts vague allegations as well pleaded if they give the opposing party notice of the claim, and draws all reasonable inferences in the non-moving party's favor.[18]  A claim will be dismissed only if there is no "reasonably conceivable" set of circumstances under which the alleged facts may support it.[19]   Accordingly, the Court considers only whether Plaintiff has alleged facts that, if proven, state reasonably conceivable claims for relief, not whether Plaintiff will ultimately prevail.

### A.   Plaintiff's Derivative Standing

Under Delaware law, a plaintiff asserts a derivative action "on behalf of an entity to enforce a claim that the entity could assert."[20]   For a plaintiff to have derivative standing, this Court has two requirements: (1) stock ownership at the

---

[17]  *See generally* D.I. 16.

[18]  *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011); *see also Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99–100 (Del. 1992).

[19]  *Id.*

[20]  Del. Ch. Ct. R. 23.1

outset of the action; and (2) continuous stock ownership throughout the litigation.[21]

Further, a plaintiff must plead facts with "particularity."[22]

Plaintiff's standing to assert derivative claims on behalf of FilmPort depends on whether Plaintiff was a valid FilmPort stockholder upon her termination, and whether she has maintained continuous ownership throughout this litigation. Defendant argues that Plaintiff's derivative claims depend on whether she was a valid director.[23] The Court disagrees that the inquiry begins and ends with Plaintiff's alleged directorship. Rather, the dispositive question is whether Plaintiff adequately pleads continuous stock ownership sufficient to maintain derivative standing.

Plaintiff's alleged director status matters only because it informs whether Defendants validly terminated Plaintiff's employment and, in turn, whether the Company's subsequent exercise of the RSPA's repurchase provisions effectively extinguished Plaintiff's ownership interest. Although director status can determine whether the RSPA repurchase validly divested Plaintiff of her stock, Defendants' argument is not dispositive because Plaintiff can still maintain standing as a

---

[21] *See Parfi Holding AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 935 (Del. Ch. 2008).

[22] Del. Ch. Ct. R. 23.1

[23] D.I. 24 at 1.

stockholder if: (1) Plaintiff is still a service provider as an officer or employee; or (2) Plaintiff's original 30% stock was not subject to the RSPA.

### B.    Plaintiff's Director Status

First, the Complaint does not allege facts with particularity to support her director status. Delaware law states that "the business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors."[24] In addition to de jure status, Delaware recognizes de facto director status, where individuals can be directors "irrespective of a formal authorization."[25] However, a de facto office "must have a de jure existence or at least one recognized by law."[26]

Although Plaintiff characterizes herself as functioning as one of FilmPort's principals, Delaware corporate law distinguishes between managerial authority and board authority.[27] Officers may exercise substantial operational control over a corporation without simultaneously serving as directors.[28] Accordingly, allegations

---

[24] 8 *Del. C.* § 141 (a).

[25] *Harris v. Harris*, 289 A.3d 310, 331 (Del. Ch. 2023).

[26] *State ex rel. James v. Deakyne*, 58 A.2d 129, 131 (Del. Super. 1948).

[27] *See* 8 *Del. C.* § 141 (a).

[28] *Jones Apparel Grp., Inc. v. Maxwell Shoe Co., Inc.*, 883 A.2d 837, 852 (Del. Ch. 2004) ("Indeed, § 141(a) itself states that when management authority is delegated to 'persons' other than the board, those 'persons' shall exercise that authority only 'to such extent' as provided in the charter, suggesting that the statute contemplates at least some elimination of board authority.").

that Plaintiff negotiated with investors, supervised employees, managed business operations, or served as CEO do not themselves establish that Plaintiff occupied a seat on FilmPort's board. Accordingly, the Court evaluates Plaintiff's allegations under the specific requirements governing de jure and de facto directorships rather than the practical importance of her executive role.

Here, the Complaint does not plead facts supporting de jure or de facto status, as there is no allegation of a formal expansion of the board to add a second seat or of corporate actions holding Plaintiff out as a director. FilmPort's sole director, as appointed in its bylaws, was Mr. Accetturo, and no other director was formally appointed under FilmPort's bylaws.[29] Neither party alleges that a proper vote was held to add a second board seat, nor that a vote was held to appoint Plaintiff as a director. Without a proper vote, Plaintiff's allegation that she was given a board seat during the October 3, 2024 agreement fails.

Even with a second board seat, to be categorized as a de facto director, Plaintiff's role is unlike *Stream TV Networks*, where this Court considered whether: (1) the company held employees out as directors; (2) those employees acted as

---

[29] FilmPort's bylaws state, "[t]he number of directors constituting the entire Board of Directors is one (1). This number may be changed by a resolution of the Board of Directors or of the stockholders." D.I. 1, Ex. 10, § 3.2.

directors with the full knowledge and encouragement of the company; (3) those employees were formally invited to join the company's board; (4) those employees accepted that invitation; (5) the company publicly announced those appointments, and; (6) those employees attended board meetings.[30]

Applying those factors here, the Court finds that the pled facts show that Plaintiff was described as a FilmPort co-founder and CEO, but not as a director. Although Mr. Accetturo stated in his January 17, 2025, email to Jupiter Agency that Plaintiff was the CEO and co-founder of FilmPort, Director status and CEO status are distinct positions in the structure of a corporation, with this Court explaining that some CEO decisions require the "board's plenary authority under section 141(a) of the DGCL."[31]

The distinction is significant. In *Stream TV Networks*, the challenged individuals exercised authority uniquely associated with directors and were consistently recognized as board members by the corporation itself.[32] Here, by

---

[30] *See Stream TV Networks, Inc. v. SeeCubic, Inc.*,250 A.3d 1016 (Del. Ch. 2020).

[31] *Foley v. Session Corp.*, 345 A.3d 537, 554 (Del. Ch. 2025).

[32] *Stream TV Networks, Inc.*, 250 A.3d at 1032 ("Stream and the Rajan brothers treated the Outside Directors as directors, and all other relevant parties reasonably believed that the Outside Directors were directors. The Rajan brothers, on behalf of Stream, sent letters of invitation to join the Board to the Outside Directors. Each of the Outside Directors agreed to join the Board, and Stream announced to its investors and employees that the Outside Directors had become members of the Board.").

contrast, the Complaint principally alleges that Plaintiff acted as FilmPort's CEO and co-founder. While those allegations demonstrate a substantial leadership role within the Company, they do not reasonably support the inference that Plaintiff exercised the legal authority of a corporate director. The Complaint contains no allegation that Plaintiff participated in formal board deliberations, voted on board matters, executed written board consents, or otherwise exercised powers reserved to the board under Delaware law. Although Plaintiff did attend investor meetings, attendance is typical for other corporate roles, including CEOs, co-founders, and other employees, not just for directors.

Accordingly, on the current pleadings, Plaintiff has not shown she was a FilmPort director.

### C. Plaintiff's Stockholder Status

Plaintiff adequately pleads she is a valid FilmPort stockholder. Although she was terminated as a service provider, she alleges her original 30% equity was not subject to repurchase under the RSPA.[33] The parties present fundamentally different interpretations of the RSPA. Defendants maintain that the agreement governs Plaintiff's entire ownership interest and automatically extinguished her stock upon

---

[33] D.I. 22 at 33–34.

termination.[34]  Plaintiff, however, alleges that the RSPA documented only a portion of an already-existing ownership arrangement and therefore could not operate to repurchase equity that existed independently of the agreement.[35]  At this procedural stage, the Court need not determine which interpretation ultimately proves correct. It need only decide whether Plaintiff's interpretation is reasonably conceivable.

The RSPA defines a service provider as an "employee, advisor, consultant, officer, or director of the Company."[36]  Further, the RSPA states:

> If the Purchaser ceases to be a Service Provider . . . the Company will . . . have an irrevocable, exclusive option to repurchase . . . any shares which have not yet been released from the Repurchase Option . . . at a price per share equal to the Purchase Price . . . .[37]

Here, FilmPort terminated Plaintiff when Mr. Accetturo, as chairperson of the board, held a meeting at which termination was effected.  First, Section 5.4 of FilmPort's bylaws states that officers can only be terminated by an affirmative vote of the majority of FilmPort's board "at any regular or special meetings."[38]  FilmPort

---

[34]  D.I. 16 at 8–9.

[35]  D.I. 22 at 15–18.

[36]  D.I. 1, Ex. 4.

[37]  *Id.*

[38]  FilmPort's bylaws state that "any officer may be removed, either with or without cause, by an affirmative vote of the majority of the Board of Directors at any regular or special meeting of the board."  D.I. 1, Ex. 10 §5.4.

held this termination meeting on February 24, 2025.[39]   Although this meeting's informal character may blur the line between a regular and a special meeting, as sole director and chair, Mr. Accetturo had authority under the bylaws to call meetings as provided therein.

Both "regular" and "special" meetings are informal under sections 3.6 and 3.7 of FilmPort's bylaws, which allow the board of directors to hold "regular" meetings at any place and at any time.[40]   Further, "special meetings" must "be called at any time by the chairperson of the board, the chief executive officer, the president, the secretary, or any two directors."[41]   Given sections 3.6 and 3.7 of the bylaws governing regular and special meetings and the allegation that a meeting occurred, the Complaint supports the inference that a meeting could be held by the chair and that action to remove an officer could be taken thereunder.

Separate from her termination analysis, Plaintiff alleges an oral agreement with Mr. Accetturo for an additional 20% equity and contends the RSPA did not govern

---

[39]  D.I. 1 ¶ 49.

[40]  FilmPort's bylaws state that "[r]egular meetings of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by the board . . . Special meetings of the Board of Directors for any purpose or purposes may be called at any time by the chairperson of the board, chief executive officer, the president, the secretary or any two directors."  D.I. 1, Ex. 10 §§3.6 and 3.7.

[41]  D.I. 1, Ex. 10 § 3.7.

her initial 30% interest.[42]   Although Defendants contend the RSPA governs all shares, Plaintiff alleges her original 30% equity may not be governed by the RSPA, so she retains derivative standing as a valid FilmPort stockholder.   Defendants dispute this theory and point to the language of the RSPA and related corporate documents to establish that Plaintiff owned only the shares reflected in that agreement.[43]

At the pleading stage, the Court cannot disregard Plaintiff's factual allegations concerning the parties' oral ownership arrangement or resolve conflicting inferences arising from the documentary record.  Whether Plaintiff can ultimately substantiate the existence of an ownership interest outside the RSPA presents a factual question that cannot be resolved on a Rule 12(b)(6) motion.

Accordingly, although Plaintiff has not adequately alleged that she remained a director, and the Complaint alleges that the bylaws permitted her removal as an officer, she has sufficiently pleaded that she remained a stockholder by alleging that her original equity interest was not subject to the RSPA. At this stage, those allegations are sufficient to establish derivative standing.

---

[42]  D.I. 1 at 8.

[43]  D.I. 24 at 14.

## D.     Plaintiff's Individual Causes of Action

Plaintiff has adequately stated claims for declaratory relief and conversion.  Her breach of contract, fraud, and negligent misrepresentation claims, however, fail to state a claim upon which relief can be granted.

### 1.     Declaratory Relief

Plaintiff states a valid claim for declaratory relief.  To state a valid claim for declaratory relief, an actual controversy must be alleged, where it: (1) involves the rights of the party seeking relief; (2) is asserted against a party who has an interest in contesting the claim; (3) is between parties whose interests are real and adverse; and (4) is ripe for judicial determination.[44]

First, Plaintiff alleges an actual controversy regarding her director status and the validity of her termination and stock repurchase.  Second, Plaintiff's declaratory relief claim is properly asserted against Defendants because they have an interest in contesting this claim, specifically in not losing control of Plaintiff's repurchased equity.  Third, the asserted interests in the declaratory relief claim are real and adverse, because they involve contested ownership of FilmPort with no collusion between Plaintiffs and Defendants.  Therefore, this issue is ripe for judicial

---

[44]  *See Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662–63 (Del. 1973).

determination because Plaintiff alleges that she was wrongfully terminated and divested of her stock, two issues which this Court can resolve.

As such, Plaintiff alleges sufficient facts to state a valid claim for declaratory relief.

### 2. Breach Of Contract

Plaintiff fails to state a valid breach of contract claim. Although Plaintiff plausibly alleges that discussions occurred between herself and Mr. Accetturo concerning ownership and governance, the Complaint does not adequately distinguish between promises allegedly made by Mr. Accetturo in his personal capacity and actions taken on behalf of FilmPort.[45]

That distinction is dispositive. Under Delaware law, to state a valid breach of contract claim, three elements are required: (1) a contractual obligation, whether express or implied; (2) breach of that obligation; and (3) damages.[46] Further, a contractual obligation requires consideration, which is "a benefit to a promisor or a detriment to a promisee pursuant to the promisor's request," which cannot be fulfilled with a preexisting duty.[47] However, "officers of a corporation are not liable

---

[45] *See generally* D.I. 1.

[46] *Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1279 n. 28 (Del. 2016).

[47] *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1232 (Del. Ch. 2000).

on corporate contracts as long as they do not purport to bind themselves individually."[48]

Here, Plaintiff argues two separate contract theories. First, Plaintiff alleges that she made a contract with Mr. Accetturo to remain with FilmPort for an additional 20% equity.[49] Second, Plaintiff presents the RSPA, a written contract containing Plaintiff's stock ownership restrictions.[50] Importantly, Plaintiff's claim against Mr. Accetturo is deficient because individuals are generally not personally liable for contracts made on a corporation's behalf.[51] Plaintiff's claim also fails because the RSPA is a contract between Plaintiff and FilmPort, not Plaintiff and Mr. Accetturo individually.

The Complaint alleges that Mr. Accetturo and Plaintiff entered into an agreement in which Plaintiff would gain 20% equity in exchange for Plaintiff's remaining at FilmPort.[52] Next, Plaintiff alleges she suffered damages, including loss of equity in FilmPort, lost compensation, lost employment opportunities, damages

---

[48] *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999).

[49] D.I. 1 at 8–9.

[50] *See id*. at 12.

[51] *Wallace*, 752 A.2d 1175, 1180 (Del. Ch. 1999).

[52] D.I. 1 at 8–9.

resulting from Plaintiff's Visa complications, relocation costs, and emotional distress. Also, Plaintiff alleges sufficient facts that she provided valid consideration.[53] Plaintiff's original tasks at FilmPort as part of her CTO position are not valid forms of consideration because these were preexisting duties. However, Plaintiff alleges that she performed new tasks that were not part of her original employment scope after the contract's formation, including investor relations, financial modeling, recruitment, employee management, and video production.[54] These are valid forms of consideration because they were in addition to her original employment scope.

Nevertheless, the allegations reflect that any relevant agreements concerning stock and officer positions were made on behalf of FilmPort and not by Mr. Accetturo in his individual capacity. Although Mr. Accetturo may have contracted with Plaintiff orally on October 3, 2024, he was still contracting on behalf of FilmPort as its sole director because the oral agreement was predicated on FilmPort's stock and officer positions.

Thus, because Mr. Accetturo only contracted on behalf of FilmPort, this claim cannot withstand Defendants' motion to dismiss.

---

[53] D.I. 22 at 17–18.

[54] D.I. 1 at 11.

### 3.    Fraud And Negligent Misrepresentation

Plaintiff does not state valid claims for fraud and negligent misrepresentation because both are predicated on false representations that the Complaint and documents reflect as true.  Under Delaware law, the elements of fraud are: (1) a false representation made by the defendant; (2) the defendant's belief that the representation was false or was recklessly indifferent to its truth; (3) the defendant's intention to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or restraint from action in justifiable reliance on the representation; and (5) resulting damages.[55]  This Court has recognized that negligent misrepresentation requires: (1) a duty to provide accurate information, based on the plaintiff's pecuniary interest; (2) the supplying of false information; (3) failure to exercise reasonable care in obtaining or communicating information; and (4) damages.[56]

Here, Plaintiff alleges she relied on Defendants' statements by investing time, expertise, resources, and labor into FilmPort.[57]  Further, Plaintiff pleads damages, specifically loss of equity, lost compensation, and emotional distress.[58]  When Mr.

---

[55]  *See Valley Joist BD Holdings, LLC v. EBSCO Indus.*, Inc., 269 A.3d 984, 988 (Del. 2021).

[56]  *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 147 n. 44 (Del. Ch. 2003).

[57]  D.I. 1 ¶¶ 52, 55, 63; D.I. 1, Ex. 12.

[58]  *Id.*

Accetturo made the October 3, 2024 offer, he owed a duty to Plaintiff to provide accurate information, given that Plaintiff had a pecuniary interest in FilmPort specifically tied to her stockholdings and employment status.[59]

However, Plaintiff alleges that, to prevent her departure, Mr. Accetturo offered her an additional 20% equity, expressly representing that she was a 50% stockholder.[60] Plaintiff pleads that those representations were false, and that Mr. Accetturo made these false statements to induce her to remain at FilmPort and forego other employment opportunities.[61] The RSPA and Cap Table show that Plaintiff was, in reality, a 50% stockholder, with Mr. Accetturo acknowledging Plaintiff's status in the Jupiter and Visa letters.[62] Plaintiff repeatedly alleges throughout the Complaint that she did become a fifty-percent stockholder, and she relies upon the RSPA, capitalization table, and multiple written communications as evidence confirming that ownership status.[63] Because Plaintiff's own theory depends upon the truth of those representations at the time they were made, the Complaint does not plausibly plead the threshold element of either fraud or negligent

---

[59] D.I. 22 at 33–34.

[60] *Id*. at 5.

[61] *Id.* at 33–34.

[62] D.I. 1, Ex. 5–6.

[63] *See generally* D.I. 1.

misrepresentation—a false statement of existing fact.[64] Therefore, Plaintiff does not allege sufficient facts to state a valid claim for fraud and negligent misrepresentation.

### 4. Conversion

Plaintiff adequately states a valid claim for conversion. This Court has defined conversion as an "'act of dominion wrongfully exerted over the property of another.'"[65] A corporation can commit conversion when it takes "the plaintiff's shares without authority."[66]

The Complaint alleges Plaintiff owned 9 million FilmPort shares and Defendants exercised dominion by repurchasing those shares without authority under the RSPA.[67] This repurchase was thus a wrongful exertion of control over Plaintiff's property. Unlike Plaintiff's fraud-based claims, the viability of the conversion claim turns principally upon ownership rather than intent.[68] Because the Court concludes that Plaintiff adequately pleads the continued existence of at least a potential ownership interest, notwithstanding Defendants' asserted repurchase, it

---

[64] D.I. 22 at 33.

[65] *Foley*, 345 A.3d at 550 (Del. Ch. 2025) (quoting *McGowan v. Ferro*, 859 A.2d 1012, 1040 (Del. Ch. 2004), *aff'd*, 873 A.2d 1099 (Del. 2005)).

[66] *Id.*

[67] D.I. 1 at 39–40.

[68] *Id*.

cannot conclude as a matter of law that Defendants' exercise of dominion over those shares was authorized.[69] That issue necessarily turns upon disputed factual questions for trial.

Therefore, Plaintiff has plead sufficient facts to state a valid claim for conversion.

### E. Leave To Amend

Leave to amend is denied. Under Delaware law, "leave to amend should be freely granted when justice so requires."[70] However, "[i]f a party neither amends nor moves to amend by the time set forth in Rule 15(a)(5)(A), a dismissal under Rule 12(b)(6) or 23.1 will be with prejudice—but only as to the named party—unless the Court for good cause shown dismisses the complaint without prejudice."[71]

Here, leave to amend is denied because Plaintiff neither filed her amended complaint before her reply brief to Defendants' motion to dismiss, nor has Plaintiff shown good cause under Rule 15(a)(5)(B). To show good cause, a plaintiff must attempt to show "why dismissal with prejudice would be unjust."[72] Here, Plaintiff

---

[69] *Id.*

[70] Ct. Ch. R. 15(a)(2).

[71] Ct. Ch. R. 15(a)(5)(B).

[72] *Larkin v. Shah*, 2016 WL 4485447, at *21 (Del. Ch. Aug. 25, 2016).

does not argue good cause in her complaint and answering brief, and she does not explain why dismissal with prejudice would be unjust.[73]  Importantly, Rule 15(aaa), the precursor to Rule 15(a)(5), was written to induce plaintiffs to either "stand on the complaint and answer the motion; or, to amend or seek leave to amend the complaint before the response to the motion was due."[74]

As such, leave to amend is denied.

## III.    CONCLUSION

For the reasons above, Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.  As to Defendants' motion to dismiss for Counts I–V, VII, and XI of Plaintiff's complaint, it is **DENIED**.  As to Defendants' motion to dismiss for Counts VIII–X, it is **GRANTED** with prejudice.

Exceptions are permitted in accordance with Court of Chancery Rule 144, however exceptions are stayed until resolution of the remaining claims.

Respectfully submitted,

*/s/ Loren Mitchell*

Magistrate in Chancery

---

[73]  *See generally* D.I. 1; D.I. 22.

[74]  *Braddock v. Zimmerman*, 906 A.2d 776, 783 (Del. 2006).